UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI

UNITED STATES

v.  Criminal No. 3:18-cr-00077-GHD-RP

COREY DELMAR SMITH

## MEMORANDUM OPINION

Officer Hunter Solomon of the Hernando Police Department performed a search of a vehicle owned and driven by the defendant, Corey Delmar Smith. The search revealed a number of stolen driver's licenses, social security cards, and devices to produce counterfeit identification documents and checks. Smith was indicted in this Court for possessing the stolen identification documents with intent to defraud and possessing the counterfeit-making devices with intent to defraud.

Smith moves to suppress [Doc. 10] the evidence obtained. The Court held an evidentiary hearing on this matter, received briefs from the parties, and is now ready to rule. For the reasons set forth below, the Court finds that the motion should be denied and the evidence should not be suppressed.

**Factual Findings**

From the testimony given at the evidentiary hearing conducted in this matter, and other evidence submitted by the parties, the Court finds the following occurred:

On October 17, 2017, Solomon was observing northbound traffic on Interstate 55 in Hernando, Mississippi. Solomon saw a black Chevrolet Suburban that did not have a license plate. Solomon initiated a stop of the vehicle at 5:57 p.m. Solomon positioned his patrol car so that it was behind the Suburban and offset to the left, closer to traffic, than the vehicle. He was joined on site by Officer Tarra Davis.

1

Upon stopping the vehicle, Solomon was able to observe a Texas paper license tag in the rear window. Solomon approached the vehicle and found it occupied by Smith, who was driving, and two passengers, Willie Carroll and Gregory Carter. Solomon removed Smith from the vehicle and brought him to the rear of the vehicle to speak to him. Smith informed Solomon that he was traveling from Texas to Indiana to pick up an icemaker for a restaurant he owned in Texas. Smith stated that Carroll and Carter worked for him, that he had picked up them up in Jackson, that they were traveling to Memphis that night, on to Indiana to purchase the icemaker, and then back to Texas.

Solomon then went to the passenger side of the vehicle to speak to Carroll and Carter and check their identification. Carroll told Solomon that he did not know Smith very well, and that they were traveling to Memphis that evening for a party and then back to Jackson the next day. Carter stated that he had worked for Smith at one point, and told Solomon that they were going to Memphis for a party, but he did not know when they were going back to Jackson. Neither knew of a trip to Indiana to pick up an icemaker. At 6:10 p.m. Solomon was informed that Carroll had an outstanding warrant for his arrest. Solomon placed Carroll under arrest and put him in Davis's patrol car.

Solomon removed Carter from the vehicle and placed him alongside Smith at the front of Solomon's patrol car. Solomon asked Smith for permission to search the vehicle. Smith denied permission and became upset. Solomon then retrieved his canine unit, Krash, and, at 6:21 p.m. deployed Krash to sniff the car.

Solomon and Krash began a sweep at the rear driver side of the vehicle. They crossed behind the vehicle and on to the passenger side. While sweeping the passenger side, Krash paused

2

and then alerted by sitting. Solomon proceeded to search the vehicle. At 6:40 p.m., Solomon began uncovering the subject evidence in the vehicle.

## Legal Standard

Generally, on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his constitutional rights. *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001). However, "[w]hen the government searches or seizes a defendant without a warrant, the government bears the burden of proving, by a preponderance of the evidence, that the search or seizure was constitutional." *Id.*

## Analysis

Smith argues there are three grounds for suppressing the evidence obtained from the vehicle. First, Smith argues Solomon did not have not have reasonable suspicion to prolong the traffic stop after determining Smith and his passengers' identities and determining that status of his tag in order to conduct a narcotics investigation. Second, Smith argues Solomon did not have reasonable suspicion to prolong the traffic stop to perform a sweep of the vehicle with Krash. Third, Smith argues that during the sweep, Solomon manipulated Krash to falsely alert. Smith also argues that even if Krash did alert, it was unreliable such that his alert did not give Solomon probable cause to search the vehicle.[1]

### I. Did Solomon have reasonable suspicion to prolong the stop?

Traffic stops are seizures for Fourth Amendment purposes. *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). The legality of a traffic stop is analyzed under the two-part

---

[1] Smith also argues that Solomon lacked probable cause of the commission of a crime to arrest Smith. True or not, whether Solomon had probable cause to arrest Smith has no bearing on whether Solomon was justified in prolonging the traffic stop or searching the car, all of which occurred before Solomon arrested Smith.

3

*Terry* framework, asking whether the officer's action was "(1) 'justified at its inception', and (2) 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 19–20, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)).

"For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *Id.* (citing *United States v. Breeland*, 53 F.3d 100, 102 (5th Cir. 1995)). No party disputes that Solomon had reasonable suspicion to initially stop Smith for driving a vehicle without a visible tag. The facts show that Smith did not have a metal license plate on his vehicle, and Solomon testified that the paper tag was difficult to see in the rear window of Smith's vehicle.

Under the second *Terry* prong, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop . . . ." *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir.2004) (en banc). "A seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614, 191 L. Ed. 2d 492 (2015). "[T]he tolerable duration of police-inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Id.*

As part of his initial investigation, an officer may "examine driver's licenses and vehicle registrations and run computer checks . . . ." *United States v. Pack*, 612 F.3d 341, 350 (5th Cir.), *opinion modified on denial of reh'g,* 622 F.3d 383 (5th Cir. 2010) (citing *Brigham*, 283 F.3d at 508.) He may also ask questions about the "purpose and itinerary of the occupants' trip as a part of his investigation . . . ." *Id.* Further, "the Fourth Amendment permits '[a] police officer [to] undertake similar questioning of the vehicle's occupants to verify the information provided by the

driver.'" *Brigham* 283 F.3d at 508 (quoting *United States v. Linkous*, 285 F.3d 716, 719 (8th Cir. 2002)) (alterations in *Brigham*). "[I]f additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed." *Lopez-Moreno*, 420 F.3d at 431.

Reasonable suspicion requires an officer "to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 676, 145 L. Ed. 2d 570 (2000) (internal quotations omitted). "Reasonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the search and seizure." *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006). The determination of whether reasonable suspicion exists is based on the "totality of the circumstances and experience of the officer". *Id.* at 631–632. In assessing the totality of the circumstances, the Court must give due weight to the factual inferences drawn by the officer, who may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 750, 151 L. Ed. 2d 740 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S. Ct. 690, 66 L.Ed.2d 621 (1981)).

In this case, the tolerable duration of the stop was only so long as necessary to investigate and determine whether Smith was driving without a tag, unless, during his investigation of that violation, Solomon developed reasonable suspension to further detain Smith. *Rodriguez*, 136 S. Ct. at 1614. ("An officer, in other words, may conduct certain unrelated checks during an otherwise

5

lawful stop. But . . . he may not do so in a way the prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.")

Though Smith frames both the prolonging the stop to launch a narcotics investigation and the prolonging of the stop to deploy the drug dog as separate grounds for suppression, they are really one in the same. The use of a drug dog during a lawful traffic stop "does not implicate legitimate privacy interests." *Illinois v. Caballes*, 543 U.S. 405, 409, 125 S. Ct. 834, 838, 160 L. Ed. 2d 842 (2005). Rather, delaying a traffic stop without reasonable suspicion, in order to allow a dog to sweep the car is when an illegal seizure occurs. *Rodriguez*, 135 S. Ct. at 1616 ("The critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff 'prolongs'—*i.e.,* adds time to—'the stop.'") If, during his initial stop, Solomon developed reasonable suspicion to investigate for the possession of narcotics, then he was permitted to detain Smith for the time reasonably necessary to investigate that crime, including time reasonably necessary to perform sweep of the car with Krash. Solomon deployed Krash approximately ten minutes after he began his narcotics investigation. The Court does not find the time from when the investigation began until Krash was deployed to be an unreasonable delay. The question is whether Solomon developed reasonable suspicion of criminal activity such that he could prolong the stop at all.

Solomon asserts his reasonable suspicion was grounded in the inconsistent statements given to him by Smith, Carroll, and Carter about the purpose of their trip and where they were headed. Solomon testified that in his experience, when drivers and passengers, especially those stopped along I-55, give such inconsistent statements, it is usually because they are illegally transporting narcotics, firearms, or other contraband.

6

Several Fifth Circuit panel decisions have indicated that mere "inconsistent stories between a driver and a passenger do not constitute articulable facts that support a reasonable suspicion of drug trafficking." *Id.* at 631; *United States v. Santiago*, 310 F.3d 336, 342 (5th Cir. 2002); *United States v. Jones*, 234 F.3d 234, 241–42 (5th Cir. 2000). Subsequent panels, however, have determined that the case upon which those decisions relied, *United States v. Dortch*, 199 F.3d 193 (5th Cir. 1999), *opinion corrected on denial of reh'g*, 203 F.3d 883 (5th Cir. 2000), was abrogated by *United States v. Brigham*, 382 F.3d 500 (2004). *See Pack*, 612 F.3d at 352. The Fifth Circuit in *Pack* stated that:

> Pack argues that our opinions in *Jones* and *Santiago* established that inconsistent stories are insufficient to create reasonable suspicion. Our opinions in *United States v. Estrada* and *United States v. Gonzalez* contain *dicta* that support this argument. *Estrada*, 459 F.3d at 631; *Gonzalez*, 328 F.3d 755, 758 (5th Cir.2003). Nevertheless, we find that this argument is without merit, (1) because Pack's inconsistent story is not the only factor that Worley cited as having caused him to suspect that Pack was engaged in criminal activity, (2) because we believe that these cases rely on the portion of *Dortch* that we have held was abrogated by our en banc opinion in *Brigham,* and (3) because the inconsistent stories of Pack and Williamson here are properly distinguished from the minor or irrelevant inconsistencies found in the cases Pack would have us follow.

*Id.* at 358. More recently, the Fifth Circuit has stated that extended detentions are permissible when "factors such as nervousness and presence on a known drug-trafficking corridor [are] coupled with the fact that the defendant provided false or implausible information regarding his travel plans." *United States v. Davis*, 620 F. App'x 295, 299 (5th Cir. 2015) (citing *Pack*, 612 F.3d at 352, 361; *United States v. Fishel*, 467 F.3d 855, 856 (5th Cir. 2006); *Brigham*, 382 F.3d at 504, 508–09))

In *Davis*, the court, reviewing the denial of a motion to suppress evidence, considered whether the defendant's minor inconsistent statements about his criminal history and travel plans

7

gave rise to reasonable suspicion of criminal activity. *Id.* at 299. Though the Fifth Circuit ultimately affirmed the district court for other reasons, the Fifth Circuit found that the inconsistent statements given by the defendant in that case did not provide an articulable basis for reasonable suspicion:

> Although Smith indicated that Davis made inconsistent statements regarding his criminal history, he did not identify the statements, their inconsistencies, or the reason they aroused his suspicions. In contrast, the officers in *Brigham* and *Pack* identified specific inconsistencies, including contradictions in the statements made by the driver and his passengers regarding travel plans, conflicts in the driver's own statements, and fabrications about a passenger's identity.

*Id.* (citing *Pack*, 612 F.3d at 345–46 and *Brigham*, 382 F.3d at 504–05).

The Court can thus extrapolate from these cases that in order for inconsistent statements by vehicle occupants to arouse reasonable suspicion the inconsistencies must be significant, the officer must be able to identify the inconsistencies, and he must be able to explain why those statements coupled with additional factors made him believe specific criminal activity was underway.

The Court finds the government has met that burden here. Solomon identified the inconsistent statements at issue: that Smith told him that Carroll and Carter worked for him and they were traveling to Indiana to obtain an ice machine; Carroll stated that he did not know Smith well at all; Carter stated he did not currently work for Smith; and both denied having any knowledge about a trip to Indiana.

These inconsistencies are more significant than not. Most notably, Carroll and Carter denied having knowledge that they were being taken on a trip three states away. This is much more akin to the inconsistent stories provided in *Brigham* and *Pack*, where the defendants could not provide consistent stories about the duration and purposes of their respective trips. In both cases

8

the prolonging of the stops were upheld. *Brigham*, 382 F.3d at 509–512; *Pack*, 612 F.3d at 358–362.

Finally, Solomon was able to identify why those inconsistent statements raised suspicion of criminal activity. I-55 is a major interstate highway, running from New Orleans, Louisiana to Chicago, Illinois. As he testified, it is commonly used to transport contraband throughout this state. Those facts, coupled together, provided Solomon with reasonable suspicion to extend the stop and further investigate. *See Pack*, 612 F.3d at 362 ("Considering the large volume of contraband that is moved along our major highways on a daily basis . . . a reasonable officer could fairly conclude that the most likely single alternative explanation, for the nervousness and irreconcilable stories raising reasonable suspicion of some criminal activity, is that the occupants are carrying contraband, particularly when the stop occurs on a highway that is frequently used by smugglers.").

The Court does note that on cross-examination Solomon stated that the had a "hunch" that Smith was engaged in illegal activity because of the inconsistent stories given to him. While a mere "hunch" is not reasonable suspicion, the Court must give weight to the specific facts and reasons to which Solomon testified. Those facts and reasons justified the prolonged detention in this instance. The Court finds that the information provided to Solomon during his investigation of Smith's license plate violation gave him reasonable suspicion to further investigate, and that the entire length and the scope of search was reasonable.

## II. Did the dog's alert provide probable cause to search Smith's vehicle?

Smith next challenges Krash's alert in two ways. First, Smith asserts that Solomon yanked Krash's leash causing him to sit, which was Krash's alert indication. Second, Smith argues that Krash is unreliable such that his alert cannot constitute probable cause.

9

An alert by a drug dog is sufficient to create probable cause for a search. *United States v. Rivas*, 157 F.3d 364, 368 (5th Cir. 1998). Whether a dog alerts is a question of fact. *United States v. Mason*, 628 F.3d 123, 130 (4th Cir. 2010). The Supreme Court has explained:

> [A] probable-cause hearing focusing on a dog's alert should proceed much like any other. The court should allow the parties to make their best case, consistent with the usual rules of criminal procedure. And the court should then evaluate the proffered evidence to decide what all the circumstances demonstrate. If the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause. If, in contrast, the defendant has challenged the State's case (by disputing the reliability of the dog overall or of a particular alert), then the court should weigh the competing evidence . . . . The question—similar to every inquiry in probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime.

*Florida. v. Harris*, 568 U.S. 237, 247–48, 133 S. Ct. 1050, 1058, 185 L. Ed. 2d 61 (2013). Even if the dog is generally reliable, "circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions." *Id.*

In this case, Krash gave his "alert" signal by sitting. As to whether Solomon manipulated Krash to alert, the Court finds that the government has established he did not. Solomon testified that when deploying Krash, he utilized a collar and leash attached to a "dead ring" that allowed Krash to move around with no tension on his collar. He also demonstrated how the leash worked. Solomon testified that while performing this sweep, he handled Krash's leash as he always does. He further testified that he left slack on the leash the entire time Krash swept the vehicle.

Officer Davis testified that she had seen Solomon deploy Krash multiple times. She testified that he typically left slack in Krash's leash when deploying him. She further testified that she did not see Solomon pull on Krash's leash when sweeping the vehicle.

10

Smith testified that he observed Solomon pulling the leash, causing Krash to stop and sit. The Court does not find Smith's testimony in that respect credible enough to overcome Solomon and Davis's testimony. Both Solomon and Davis testified that Solomon's patrol car was parked behind Smith's Suburban and offset to the left, meaning that the patrol car was parked closer to the highway than Smith's vehicle. All parties testified that while Solomon deployed Krash, Smith and Carter were standing in front of, or sitting on, the hood of Solomon's patrol car. Smith's car was a large SUV. Krash alerted in the middle of the passenger side, on the right of the vehicle. Because Smith would have been several feet behind the SUV and over to the left, it is doubtful he would have been able to clearly witness Solomon manipulating Krash's leash at the right of the vehicle. Further, even if Smith did witness Solomon pulling Krash's leash, Solomon's testimony and demonstration about how the leash worked showed that Solomon could move the leash without placing tension on Krash's collar. Accordingly, the Court finds that Krash made a valid alert.

Next, the Court must decide whether Krash's was reliable enough such that his alert would provide probable cause that narcotics were in the car. "[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Id.* at 246. Likewise, "if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs," the dog may be deemed generally reliable. The defendant may challenge the dog's reliability by "cross-examining the testifying officer or by introducing his own fact or expert witnesses." *Id.* at 247.

Solomon testified that he and Krash regularly trained together. The government introduced training logs and certificates obtained by Solomon and Krash. That is sufficient evidence of Krash's reliability. Nothing solicited by Smith on cross-examination calls Krash's reliability into doubt. Although Smith asked about Krash's demeanor during this sweep and whether he'd been

given food or water that day, nothing was said that calls into doubt Krash's reliability. And while Solomon stated that Krash was rewarded with a tennis ball in training sessions for finding contraband, that does not undermine his reliability *See United States v. Lozano*, No. 2:17-CR-605, 2017 WL 6508410, at *2 (S.D. Tex. Dec. 20, 2017).

Smith's sole basis for challenging Krash's reliability is that Krash provided a false positive on this occasion. There is no evidence that Krash is trained to detect ID's and social security cards and no narcotics were found in the vehicle. But the Supreme Court has instructed courts to be wary of on-field results when assessing a dog's reliability:

> Conversely (and more relevant here), if the dog alerts to a car in which the officer finds no narcotics, the dog may not have made a mistake at all. The dog may have detected substances that were too well hidden or present in quantities too small for the officer to locate. Or the dog may have smelled the residual odor of drugs previously in the vehicle or on the driver's person. Field data thus may markedly overstate a dog's real false positives. By contrast, those inaccuracies—in either direction—do not taint records of a dog's performance in standard training and certification settings.

*Harris*, 568 U.S. at 245–46, 133 S. Ct. 1050. From the evidence presented, the Court finds that Krash was reliable in this instance.

**Conclusion**

The Court finds that during Solomon's initial investigation of the traffic violation he developed reasonable suspicion to permit him to further detain Smith, investigate whether a narcotics crime was occurring, and deploy a drug dog to sniff Smith's vehicle. The Court further finds that the dog's alert was reliable and provided Solomon with probable cause to search Smith's vehicle. Accordingly, the Court finds the government has carried its burden of establishing the

validity of the search, and the evidence derived from it should not be suppressed. Smith's motion is denied.

An order in accordance with this opinion shall issue.

SO ORDERED, this the 27th day of November, 2018.

/s/ Glen H. Davidson
SENIOR U.S. DISTRICT JUDGE